# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

CHIHUAHUAN GRASSLANDS
ALLIANCE, et al.,

      **Plaintiffs,**

vs.                                  **CIV 03-1423 WJ/LAM**

GALE NORTON, Secretary of the
U.S. Department of the Interior, et al.,

**Defendants.**

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF IN REVIEW OF AGENCY ACTION

THIS MATTER comes before the Court upon Plaintiffs' Motion for Review of Agency Action, filed October 1, 2004 (**Doc. 19**), following oral argument which took place on January 24, 2007. After the hearing, parties were allowed to supplement the briefing, in light of recent case law on the issues raised. This action arises out of Defendants' January 22, 2003 competitive oil and gas fluid minerals lease sale of public lands in the area commonly known as the Nutt Grasslands. Plaintiffs in this lawsuit are nonprofit or local community environmental organizations who bring this civil action against the above named Defendants (hereinafter "BLM" or "the Agency").[1]

Plaintiffs seek declaratory and injunctive relief against BLM pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., for the Agency's alleged

---

[1] Defendants are various federal agencies and officials representing these agencies. The lease sale at issue in this case was carried out by the United States Bureau of Land Management ("BLM"), one of the named Defendant agencies.

violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq; and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1782 (1976 & Supp. III 1979).  Plaintiffs allege that BLM's failure to comply with mandatory duties under the NEPA and the FLPMA have resulted in an increased risk of environmental harm through uninformed management and decision-making.

Parties agree that the action which Plaintiffs challenge is a final agency action under 5 U.S.C. §§ 702, 704 and 706, and thus, this Court has jurisdiction over the matter.

## BACKGROUND

As described in the Complaint, Plaintiff Chihuahuan Grasslands Alliance is a newly formed local community organization consisting of residents, scientists, ranchers and landowners from Sierra and Luna counties of New Mexico, which endeavors to preserve and protect the great Grasslands.  Plaintiff New Mexico Wilderness Alliance is a nonprofit public interest organization organized under the laws of New Mexico dedicated to the protection and restoration of all remaining wildlands in New Mexico.  Plaintiff Sky Island Alliance is a nonprofit public interest organization organized under the laws of Arizona and dedicated to the preservation and restoration of native biological diversity in the sky islands of the southwestern United States and northwestern Mexico.

I.      **Legal Frameworks**

A.      **NEPA**

The purpose of the National Environmental Policy Act of 1969 ("NEPA") is to ensure that federal agencies take a "hard look" at the environmental ramifications of their actions.  Middle Rio Grande Conservancy Dist. v. Norton, 294 F.3d 1220, 1224 (10th Cir. 2002); Baltimore Gas

& Electric Co. v. Nat'l Res. Defense Council, 462 U.S. 87 (1983); 42 U.S.C. § 4332(2)(C).   To

this end, NEPA directs agencies to prepare a detailed statement on the environmental impact for

all "major Federal actions significantly affecting the quality of the human environment." Middle

Rio Grande Conservancy Dist., 294 F.3d at 1224 (citing 42 U.S.C. § 4332(2)(C)).  This "detailed

statement" is labeled an Environmental Impact Statement, or "EIS."  See 40 C.F.R. § 1508.11.

Federal agencies frequently conduct an Environmental Assessment ("EA") as a preliminary step

before engaging in the lengthy and expensive investigation necessary to issue an EIS.   294 F.3d at

1224.  The EA determines whether the proposed action is one that may significantly affect the

quality of the human environment, and is intended to be a concise summary of an agency's analysis

of whether the proposed action could result in significant impacts.   Id. (citing 40 C.F.R. §§

1501.4(b) & (c); §1508.9.   If the EA results in a finding of possible significant impacts, NEPA

requires the preparation of an EIS.  If an agency instead makes a finding of no significant impacts

("FONSI"), an EIS is not required.  Id. (citing 40 C.F.R. § 1508.13); see also Pennaco Energy,

377 F.3d at 1151 ("agencies need not prepare a full EIS if they initially prepare the less detailed

EA, and based on the EA, issue a [FONSI] concluding that the proposed action will not

significantly affect the environment").  Agencies are supposed to perform a "hard look" before

committing irretrievably to a given course of action, so that the action can be shaped to account

for environmental values.   Sierra Club v. Hodel, 848 F.2d 1068, 1093 (10th Cir. 1988) rev'd on

other grounds, 949 F.2d 362 (10th Cir. 1991).

     **B.     FLPMA**

          The Federal Land Policy and Management Act of 1976 ("FLPMA") establishes a policy of

"multiple use" land management.  The FLPMA was enacted in recognition of the need "to provide

guidance and a comprehensive statement of congressional policies concerning the management of the public lands." Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734, 737 (10th Cir. 1982).  Under the FLPMA, "Congress provided that the BLM should manage the public lands by using the Act's procedures in a dynamic, evolving manner to accommodate these competing demands." Id. at 738.  Congress directed the BLM to manage the public lands on a "multiple use" basis, making the most judicious use of the land for some or all of the public land resources. Thus, under the FLPMA, a federal agency need not permit all resource uses on a given parcel of land, if appropriate.  696 F.2d at 738.  Under the "multiple use" concept, the BLM conducts inventories of public lands and incorporates those inventories through resource management planning.

### C.    Mineral Leasing Act of 1920, 30 U.S.C. § 226

Under this Act (as amended by 30 U.S.C.A. § 181 et seq., Federal Onshore Oil and Gas Leasing Reform Act of 1987 ["FOOGLRA"]), the Secretary of the Department of the Interior has the authority to issue leases for "oil and gas deposits."  § 226(a).  The Secretary also has authority under this provision to ensure that adequate financial arrangements are in place to ensure the restoration of any lands or surface waters that were adversely affected by lease operations after the cessation of oil and gas operations. § 226(g).

### D.    Federal Regulations

Federal regulations, promulgated by the Council on Environmental Quality ("CEQ"), set out the basic requirements for compliance, including instructions to agencies in the technical

preparation of NEPA documents. 40 CFR § 1500.1.[2]  The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance  the environment.  40 C.F.R. 1500.1(c).  CEQ regulations under NEPA require an EA to be prepared for all major federal actions as a kind of crossroads in the compliance process.  As mentioned previously, the EA is followed either by a finding that the action will have no significant impact on the human environment ("FONSI") or by the preparation of an Environmental Impact Statement ("EIS").  CEQ regulations  unambiguously require the preparation of an EIS, or alternatively an EA followed by either a FONSI or an EIS for all major federal actions that have not been categorically excluded.  Sierra Club v. Hodel, 848 F.2d at 1093 (citing Andrus v. Sierra Club, 442 U.S. at 357 and 40 C.F.R. § 1501.4)).

The Court's discussion will begin with some background information on oil and gas leasing, as well as its application to the Nutt Grasslands, to put into context the legal issues the Court must address.

## II.      Oil and Gas Leasing and Development on Federal Public Lands

Oil and gas exploration and development generally involves a broad range of impacts to water, air, open space, ecosystems, wildlife, wildlands, economics and public health.  Mineral leasing and development on federal public lands is usually conducted through a five stage decision-making process in accordance with, *inter alia*, the Mineral Leasing Act of 1920 and the Federal Onshore Oil and Gas Leasing Reform Act of 1987.

---

[2]  The Council on Environmental Quality ("CEQ")  was formed in 1970 to promulgate regulations binding federal agencies in implementing NEPA.  42 U.S.C. § 4342; Exec. Order No. 11991 of May 24, 1977.  See, Utahns for Better Transp. v. U.S. Dept. of Transp. 305 F.3d 1152, 1163 n.2 (10th Cir. 2002).

The first stage of mineral leasing and development involves the development of a
Resource Management Plan ("RMP").  The RMP functions as a course filter to broadly assess the
entire BLM resource area to determine what areas should be open to potential leasing, what areas
should be closed, and whether any lands open to mineral leasing should be subject to certain
constraints, such as seasonal timing restrictions.  Part of the decisions at the RMP-level is based
on the completion of an EIS.

The second stage of mineral leasing and development involves the actual lease of discrete
parcels.  BLM retains discretion at this stage to include or exclude specific lands from the lease
sale, even when those lands are identified as "open" for leasing.  Land parcels identified as "open"
for leasing are often "clumped" together on contiguous and interconnected landscapes for the
sake of economic and development efficiency.  Once the specific lease parcels are identified, the
BLM holds a "competitive lease sale."   The parcel continues to be available for "noncompetitive
bidding" if the lease parcel offered for sale either is not bid upon, or the bids received fail to
satisfy minimum sale requirements.

Once a mineral lease is granted, the lessee proceeds to the third stage the process, where
the lessee "explores" the parcel for mineral resources, which may involve various methods.  If
mineral deposits are found, the lessee proceeds with full-field development in the fourth stage.

In the fifth and final stage of the mineral leasing and development process, the BLM
oversees reclamation of the lease parcel when the well becomes "uneconomic. "  Reclamation is
intended to leave the land in the same condition as it was beforehand.

The instant case concerns the first and second stages of the mineral leasing and
development process, and the implications of decisions made in the first and second stages on

6

subsequent stages in the process.  Plaintiffs allege that BLM improperly issued binding mineral leases before the agency completed a site-specific assessment of environmental impacts to the landscape.

### III.    Factual Background Leading up to Litigation

This lawsuit involves the BLM's actions in the Luna County portion of the Nutt Grasslands, which is managed as part of the BLM's Mimbres Resource Area.  The Mimbres Resource Area encompasses BLM-administered public land in Dona Ana, Luna, Hidalgo and Grant Counties in southwestern New Mexico The Nutt Grasslands is 450,000 acres of a vast grassland ecosystem located in south-central New Mexico in Luna and Sierra Counties.

### A.    BLM Management of the Nutt Grasslands Leading up to Lease Sale

In November, 1993, the BLM prepared a comprehensive land use plan entitled the final Mimbres Resource Management Plan ("RMP" at Ex. 1 in the AR).[3]  This final RMP was based on an environmental impact statement prepared by BLM in October 1992, in a joint document entitled "Proposed Resource Management Plan/Final Environmental Impact Statement" ("RMP/FEIS" or "FEIS") (Ex. 31 in the AR).  The final version of the RMP covered the Mimbres Resource Area, and encompassed literally millions of surface and subsurface acres of federal public land.   The document contains numerous decisions pertaining to land ownership adjustments, vehicle designations, rights-of-way, minerals, recreation, cultural resources, wildlife, watershed, vegetation management and conservation.  In the specific context of mineral resources, and in accord with the first stage of the mineral leasing and development process, the

---

[3]  References to exhibits are from the four-volume Administrative Record which was lodged with the Court (Doc. 18).  Specific pages from the Administrative Record will be referred to as "AR."

RMP opened 3,532,300 acres to potential mineral leasing, including portions of the Grasslands, subject to standard terms and conditions.

The RMP opened an additional 65,000 acres to leasing with "no surface occupancy" and closed 266,950 acres to potential mineral leasing in Areas of Critical Environmental Concern.  It designated a large area of the Grasslands as the "Cooke's Range/Nutt Habitat Management Plan ("HMP").[4]  HMP's are designed to improve wildlife habitat, but does not prohibit oil and gas leasing and development.  Areas designated as Wilderness and Wilderness Study Areas are, by law, automatically closed to fluid minerals leasing.

Beginning in the Spring of 1999, the New Mexico Wilderness Alliance ("NMWA"), one of the Plaintiffs' groups in this case, conducted a field inventory of public wildlands throughout the state of New Mexico ("Citizen Wilderness Inventory").  The purpose of the Citizen Wilderness Inventory was to assess the suitability of public lands for Wilderness designation and to identify any illegal activities or impacts within designated wilderness areas.  NMWA identified 75,014 acres of BLM lands in six different land units that qualify for Wilderness designation and which it contended would be affected by the oil and gas leasing decisions the agency was considering.

In the fall of 2002, the BLM completed a Documentation of Plan Conformance and NEPA Adequacy ("DNA") for the lease parcels, which concluded that oil and gas development would not "substantially change" the cumulative impacts of such activities already analyzed in the RMP. AR 338.

On November 25, 2002, the BLM issued a Notice of Competitive Lease Sale for 113

---

[4]  The Nutt Grasslands fade into the foothills of the Black Range and Cookes Range to the north and west.  Complaint, ¶ 28.

parcels involving Texas, Oklahoma, Kansas and New Mexico.  Of the 113 parcels offered in the

lease sale, twenty-three parcels are within the Nutt Grasslands.  Ten of the twenty-three parcels in

the Nutt Grasslands Lease Sale were protected by No Surface Occupancy ("NSO") stipulations.

The remaining thirteen of the twenty-three parcels were not protected by NSO stipulations.

### B.    Initial Protest by NMWA

On January 13, 2003 and in subsequent correspondence, NMWA protested the Nutt

Grasslands Lease Sale on the basis that the BLM failed to conduct the requisite NEPA analysis to

support the lease sale and requested that the lease parcels be withdrawn.  Relying on its own

wilderness inventory -- the Nutt Grasslands Wilderness Proposal – the NMWA indicated to BLM

that it believed that lands covered within the inventory possessed wilderness characteristics which

should be preserved, and thus qualified for designation as Wilderness Study Areas.

The group requested that the BLM conduct a Wilderness Inventory on the lands located in

the parcel at issue, and urged the agency to follow the process contained in the agency's own

Wilderness Inventory and Study Procedures Handbook ("BLM Handbook") as the basis for

withdrawing the lease parcels in order to "offer protection to unique and important roadless

lands."  Ex. 7 at 6.  The BLM Handbook required a Wilderness Inventory on certain lands,

including:

> . . . lands within externally generated proposals that document new or supplemental
> information regarding resource uses and conditions of the lands not addressed in current
> land use plans and/or prior wilderness inventories.

Ex. 7 at 7 (quoting from BLM Handbook).

The NMWA also contended that BLM should withdraw the land parcels from oil and gas

leasing because the agency had not considered a "multiple use" concept as part of the "hard look"

it was required to take.  "Multiple use" calls for the use of public land for *less* than all of its resources, and for the management of those resources without permanent impairment of the land and quality of environment.  §1702(c).  It entails a balancing of the development of oil and gas resources against the effects on the natural character of the area.  Plaintiffs contended in the protest that this balancing should result in the BLM's withdrawal of the lease parcels in order to be in compliance with the FLPMA.

C.     **BLM's Response to NMWA's Initial Protest**

Shortly after receiving NMWA's protest, on January 22, 2003, the BLM held its competitive oil and gas lease sale involving the Nutt Grasslands.  Several parcels were acquired in that sale by Imperial Oil Properties of Wichita, Kansas, and the remaining parcels of the Nutt Grasslands Lease Sale were still available for noncompetitive acquisition until January 22, 2005.

In a decision dated April 9, 2003, the BLM rejected NMWA's argument that sufficient environmental analysis pursuant to NEPA was not conducted, explaining that it had completed an environmental assessment in two stages.  An EIS was completed in 1992 as part of the first stage of a NEPA analysis and as part of the RMP which was completed in 1993, in order to assess the impacts of land-use actions on the environment.  In the second stage, done in November 2002, the BLM completed a Documentation of Land Use Plan Conformance and NEPA Adequacy ("DNA") in which BLM considered whether, under NEPA regulations, a supplemental EIS was required because of any changed circumstances or new information which might bear on the proposed lease sale (Ex. 4).

The conclusion of the DNA was that the existing NEPA analysis was adequate to address the impacts of the proposed lease sale action.  However, because the DNA had not taken into

account NMWA's Citizen Wilderness Proposal for the lease sale, the agency suspended further issuance of lease parcels in order to determine whether those lands do in fact have wilderness characteristics, and if so, whether or not to carry those areas forward in an amendment or revision process for the RMP/FEIS.

On July 7, 2003, the BLM issued a decision rejecting the Nutt Grasslands Citizen Wilderness Proposal.  This decision was purportedly predicated on a BLM document entitled "Evaluation of the Robledo-Sierra de Las Uvas Citizen Wilderness Proposal of the New Mexico Wilderness Alliance" dated April 14, 2003.  The Robledo-Sierra de Las Uvas Citizen Wilderness proposal is located east of the Nutt Grasslands Citizen Wilderness Proposal, and are in two different locations.

### D.      NMWA's Followup Protest and BLM's Response[5]

On April 18, 2003, the NMWA sent another letter with documentation to the BLM which assessed the statewide Wilderness Inventory completed and issued by the BLM in 1980.  The group noted that Nutt Mountain and Nutt Grasslands North were not included in the BLM's 1980 Wilderness Inventory.  Ex. 14.  The NMWA also voiced its disagreement with BLM dropping the Nutt Grasslands South from the intensive inventory because the agency found that "the area obviously lacked wilderness characteristics . . . [and] lacks potential for solitude and for a primitive and unconfined type of recreation due to the relatively flat terrain and small size of the area.'"  Ex. 14, AR at 00557.

On July 7, 2003, the BLM issued a decision rejecting the Nutt Grasslands Citizen

---

[5]  Plaintiff Sky Island Alliance also protested the Nutt Grasslands Lease Sale, but BLM rejected it as untimely.  Exs. 33 & 34.  The other Plaintiff's group, Chihuahuan Grasslands, did not exist at the time of the lease sale, but was formed before the institution of this lawsuit.

Wilderness Proposal (Exs. 16, 32), and released the leases to Imperial Oil Properties.  This

decision was purportedly based on a BLM document entitled "Evaluation of the Robledo-Sierra

de Las Uvas Citizen Wilderness Proposal of the New Mexico Wilderness Alliance" dated April

14, 2003, not the Nutt Grasslands Citizen's Wilderness Proposal.  The Robledo-Sierra de Las

Uvas Citizen Wilderness proposal is located east of the Nutt Grasslands Citizen Wilderness

Proposal.  Plaintiffs contend that the two locations, while both containing citizen-inventoried

wilderness quality lands, are completely distinct entities.

**E.      Basis for Lawsuit**

Plaintiffs contend that BLM's actions have condemned the Nutt Grasslands to oil and gas

development before NEPA was complied with, before a site-specific assessment of environmental

impacts was completed, before management alternatives linked to such an assessment were

considered, and without the involvement of the public.

In Count One of the Complaint, Plaintiffs allege that the BLM violated NEPA by

proceeding with the Nutt Grasslands Lease Sale without first completing an EA or EIS, in

violation of 42 U.S.C. § 4333(2)(C), 40 C.F.R. §§ 1508.9, 1508.11.  Count Two alleges failure

by the BLM to assess the direct, indirect and cumulative environmental consequences of the Nutt

Grasslands Lease Sale to the Nutt Grasslands, and this failure was arbitrary, capricious, an abuse

of discretion and not in accordance with the law and procedures required by law.  In Count Three,

Plaintiffs allege that the BLM failed to consider a reasonable range of alternatives for oil and gas

leasing and development in the Nutt Grasslands, including a "no action" alternative, and that this

failure was arbitrary, capricious, an abuse of discretion and not in accordance with the law and

procedures required by law. Count Four asserts that Defendants failed to involve the public in the

Nutt Grasslands Lease and the execution of the RMP/FEIS, and that such failure constituted agency action which was arbitrary, capricious, an abuse of discretion, and not in accordance with the law and procedures required by law.

Plaintiffs request that the Court grant declaratory and injunctive relief to remedy the BLM's failures asserted in the Complaint, and that the Court retain continuing jurisdiction of this matter such remedies are effected.   Specifically, Plaintiffs move to set aside and declare unlawful the BLM's November 2002 DNA as well as the agency's consequent decision to sell and hold open for sale the affected oil and gas leases in the Grasslands.

### F.     Leases at Issue in Lawsuit

Many of the original leases which were the subject of this litigation have been terminated and closed.   However, the parties have stipulated to narrowing the scope of the challenge to four parcels of land, totaling 6,988.13 acres, which have been acquired by Imperial Oil Properties, Inc. of Wichita, Kansas, and which are not subject to NSO stipulations or restrictions.

## IV.   Standard of Review

Neither NEPA nor the FLPMA statutes have standards of review.   Courts use the APA standard, which states that an agency's action is illegal if it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" or "procedures required by law."   5 U.S.C. §§ 706(2)(A),(D).   The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.   Olenhouse v. Commodity Credit Corp. 42 F.3d 1560, 1574 (10th Cir. 1994) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983)).

In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment.  Id. (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrog. on other grds. by Califano v. Sanders, 430 U.S. 99, 105 (1977).  The reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  Id. (citing Motor Vehicle Mfrs., 463 U.S. at 43).  Informal agency action will be set aside as arbitrary if it is unsupported by "substantial evidence."  Substantial evidence in the APA sense means that the evidence is "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." Olenhouse, 42 F.3d at 1575 (quoting Illinois Central R.R. v. Norfolk & Western Ry., 385 U.S. 57, 66 (1966)); Pennaco Energy, Inc. et al v. Dep't of Interior et al., 377 F.3d 1147, 1151 (10th Cir. 2004) ("substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (quoted case omitted).

## DISCUSSION

## I.   Whether BLM Failed to Take a Hard Look at Environmental Consequences

In Counts I and II, Plaintiffs allege that BLM failed to assess the direct, indirect and cumulative environmental consequences of the Nutt Grasslands Lease Sale, and that this failure was arbitrary, capricious, an abuse of discretion and not in accordance with the law and procedures required by law.

Plaintiffs object to the agency's reliance on the DNA, because the DNA in turn relied on the RMP/FEIS which Plaintiffs contend did not take a sufficiently hard look at the environmental impacts of the proposed lease issuance.  Plaintiffs also claim that the agency did not give sufficient

14

consideration to the wilderness characteristics of the Nutt Grasslands.  Plaintiffs contend that the agency has two options, either of which would bring the agency into NEPA compliance: that the agency impose NSO stipulations on the four parcels at issue in this case, or that the agency conduct a pre-leasing EA or EIS to establish baseline conditions.

The Agency maintains that no new NEPA analysis is necessary to address a proposed action "as long as it has already has taken a 'hard look' at the action's potential environmental consequences."  Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976), cited in Pennaco, 377 F.3d at 1151.  In terms of what BLM is required to do in this case, the Agency asserts that further NEPA analysis is not required for pre-leasing stage because the RMP/FEIS has already taken a "hard look" at the environmental impacts associated with pre-leasing the area for oil and gas development.

### A.    NEPA Analysis and Subsequent DNA

Defendants have raised a jurisdictional issue with regard to Plaintiff's challenge to the 1993 Final RMP, based on a six-year statute of limitations under 28 U.S.C. § 2401 (time for commencing action against United States).  However, Plaintiffs frame the issue as a challenge to the adequacy of the November 2002 DNA, contending that an EA or EIS instead should have been completed for the specific parcels of land put up for lease sale.  Thus, I find the jurisdictional issue to be without merit.

Also without merit is Plaintiffs' contention that the 2002 DNA prepared by the BLM does not satisfy NEPA requirements because it is not a NEPA document, and thus falls short of NEPA requirements.  While DNA's are not mentioned in NEPA or in the regulations (unlike EA's and FONSI's), nevertheless an agency may use non-NEPA procedures such as a DNA in order to

15

decide whether new information or changed circumstances warrant new NEPA documentation. Pennaco Energy, Inc. v. U.S. Dept. of Interior, 377 F.3d 1147, 1152 (10th Cir. 2004) (noting that courts have upheld the use of non-NEPA procedures "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS").

### 1.      The DNA

The DNA essentially determined that the "current proposed action" (the lease sale) was the same action as previously analyzed in the 1993 RMP/FEIS.  It specifically stated that the RMP/FEIS had already analyzed "the effects of fluid minerals leasing"; that this analysis was adequate "in light of any new information or circumstances"; and that the land tracts to be leased fell within the areas nominated for leasing under the RMP/FEIS.  The DNA concluded that no further NEPA analysis was necessary because "appropriate environmental responsible" oil and gas exploration would not "substantially change" the cumulative impacts already analyzed in the RMP.  AR 337.

Because Plaintiffs' objections to the DNA are based on the alleged insufficiency of the RMP/FEIS as a NEPA analysis, a review of that document is appropriate.

### 2.      The 1992 RMP/FEIS

Under 40 C.F.R. §§ 1508.7 and 1508.8, the BLM was required to address the direct, indirect and cumulative impacts of the proposed action.

In Chapter I, the Agency sets forth the "purpose" and "need" behind the Proposed RMP/FEIS, and identified four "issues" and nine "management concerns" as part of the planning

process for its RMP.[6]  Oil and gas development is one of these "issues" and "management

concerns."  AR 3032-40.  The "management concern" related to "Minerals" was aimed at

determining "which public land should be open to . . . leasable mineral development subject to the

terms and conditions of the standard lease form, minor constraints such as seasonal restrictions, or

major constraints such as no surface occupancy."  AR 3035.  This section included a listing of the

elements of the proposed plan and its alternatives, and a summary of environmental impacts by

alternative.  AR 3014-3027 (and Tables S-1 and S-2)

Chapter 2 of the 1992 FEIS sets out the agency's plan for management of existing

resources in the Resource Area, including a proposed management plan for Minerals and fifteen-

year development projections for oil and gas (Ex. 31 at AR3044-50; Ex. 31, App.A-1, "Mineral

Resource Policy," AR 03484).  The agency determined that surface disturbance from geophysical

permits would have minimal effect because the management policy "required that seismic

exploration be conducted along existing roads and trails."  AR 3046.  Based on the previous

history of mineral development in the region, BLM projected the number of geophysical permits,

test ("wildcat") and production wells, access roads and acres of disturbance that would occur

over the next 15 years.  AR 3047-50.  The agency forecast that 30 geophysical exploration

_____

[6]  An "issue" is defined as "an opportunity, conflict or problem, regarding the use or management of public land and resources.  AR 3031.  The four "issues" are: Land Ownership Adjustments; Areas of Critical Concern and Other Special Management Areas; Vehicle Management; Access.

"Management concerns" are non-issue related procedures or land-use allocations which have proven to need modification during the preparation of the RMP/FEIS.  Such concerns did not appear to meet the criteria as a planning "issue" but were nevertheless identified for resolution in the RMP.  AR 3031-32.  The nine "management concerns are: Rights-of-Way; Minerals; Recreation; Cultural and Paleontological Resources; Wildlife Habitat; Soil, Air and Water; Vegetation; Riparian and Arroyo Habitats; and Special Status Species.

permits would be approved and five test wells would be drilled, resulting in one discovery well. AR 3046-47, and Table 2-4 at AR 3047 (summary of projected oil and gas development over the 15 years after issuance of the RMP).[7]

Chapter 3 identifies the environments that would be affected by the adoption of the RMP/FEIS.  Various resources were examined, including topography, climate and mineral resources.  Land characteristics were examined, such as population areas, grazing allotments and vegetation, and soil characteristics.  BLM identified the natural resources existing within the Resource Area, including identifying those lands with a moderate or low potential for producing oil and gas.  AR 3114.   The FEIS closed about 267,000 acres to fluid mineral leasing, opened 65,000 acres to leasing but with NSO stipulations permitted where appropriate.  Interestingly, no lands were rated as having a high potential for oil and gas.  AR 3114.

Chapter 4 in the 1992 EIS examines the environmental consequences and impacts which could result from the proposed RMP, for example, impacts of the plan on lands, minerals, livestock grazing, soil, air and water, and access routes which would be created as mineral exploration and development occur.  AR 3150-53.

Chapter 4 has two sections.  The first section addresses the environmental impacts that would result from any or all of the proposed alternatives ("Continued Management Guidance and Actions" (AR 3152-69).  The first section looks at the impact of mineral exploration and development on access to public  lands ("improving" access and providing approximately 22

---

[7] Geophysical exploration includes surface operations and construction of roads, but does not include core drilling for subsurface geologic information or drilling for oil and gas.  A lessee who seeks to engage in such geophysical exploration must submit a proposal and surface use plan of operations.  The agency concedes that such activity would trigger a need for further NEPA analysis.

access routes annually, AR 03153); on livestock grazing (finding that oil, gas, geothermal and mining actions would result in short-term impacts from oil and gas development, while in the long-term, "patterns would return to normal," AR 3156); on vegetation ("oil and gas activities will cause less than 10 acres of vegetation removal in 5 years," AR 3156); on soil, air and water (exploration and development "would cause soil disturbance on 123 acres per year" and noting that reclamation measures would be required for impact on water, AR 3158-59); on air quality (AR 3158-59); and on wildlife (displacement of wildlife and reducing wildlife habitat on 123 acres per year (AR 3159).

The second section of Chapter 4 continues with the impacts on the area's resources from the Proposed Plan. (AR 3169-3200, summarized in table at AR 3020).  This section examined the effect of the plan on fluid mineral resources (comparing acreage of land available under proposed plan to oil and gas potential) (AR 3170, Table); road access (finding that disposal of isolated parcels of public land would not significantly deter access, but that disposal of larger blocks "may detract" from existing access opportunities if easements aren't reserved) (AR 3174); livestock grazing (summarizing short and long-term effects of leasing public lands) (AR 3174-79); vegetation (describing beneficial and negative impacts) (AR 3181); soil and mineral development (surface disturbance in leased areas, limited effect on air quality on lands open to fluid mineral leasing with site-specific stipulations (AR 3182-83); wildlife and habitats (site-specific "habitat degradation and wildlife disturbances" on land open to fluid mineral leasing, but impacts reduced with site specific stipulations) (AR 3186).

From the foregoing summary of the 1992 EIS, it is clear that the document did more than make certain land *available* for leasing, as Plaintiffs contend.  The Agency envisioned oil and gas

leasing in this area, and examined the effects of such activity on various natural resources.  The

Nutt Grasslands is included within the area the BLM considered for the environmental impacts.

The agency took steps to open certain areas to leasing, closed other areas where oil and gas

development would be inconsistent with prudent management of federal land, and imposed NSO

stipulations where it felt it was appropriate.

### 3.      The 1993 Mimbres Resource RMP

In December 1993, following public comment and issuance in April 1993 of a Record of

Decision ("ROD") (AR 347-427), Defendants published the Final Mimbres RMP.  Ex. 1 (AR

001-294).  The Record of Decision explained that the agency had selected the proposed action,

with minor modifications that do not factor into this appeal.

The RMP closed about 267,000 acres to fluid mineral leasing, including areas of critical

environmental concern and natural landmarks.  AR 334 and AR 93 (Map 2-1).  The RMP opened

about 65,000 acres to leasing, but with no surface occupancy ("NSO") allowed.  Another 3.5

million acres were opened to mineral leasing for oil and gas, subject to standard terms and

conditions.  AR 3016, 2021 (section 6, lease terms).

Plaintiffs contend that Defendants violated NEPA by failing to take a "hard look" at the

environmental impacts of oil and gas leasing in the Nutt Grasslands before issuing the leases.  This

contention is not borne out by an examination of either the RMP/FEIS or the 1993 RMP.

Plaintiffs are correct that the RMP did not discuss environmental impacts of oil and gas leasing on

specific tracts of land parcels.  However, the agency did plan for the issuance of oil and gas leases

on federal land which included the Nutt Grasslands sufficiently to be apprised of which lands

should remain closed to leasing, and which would have NSO's attached.  See, e.g., AR 203-04

(listing areas closed to leasing and open to leasing with stipulations).

**B.      Level of Analysis Required for Pre-Leasing**

Plaintiffs contend that Defendants violated NEPA because the RMP -- on which the DNA
is based – does not justify the lease sale.  Plaintiffs claim that the RMP is generic in nature, and
extremely broad in geographic scope descriptions of the direct impacts caused by oil and gas
development. Plaintiffs do not argue for full field development at the pre-leasing stage, but claim
that Defendants have pre-leasing NEPA obligations to conduct a more site-specific analysis for oil
and gas explorations on specific land parcels, because the issuance of non-NSO leases leaves the
agency with no authority to deny a lessee's surface use rights once the lease is issued.

Defendants acknowledge that the RMP/FEIS was not intended to be site-specific, but that
it nevertheless took the requisite hard look at the impacts of oil and gas leasing in the Nutt
Grasslands.  BLM  describes the RMP as a document which sets forth goals and objectives for the
management of resources subject to BLM stewardship.   The average tract is 2,000 acres, and
drilling occurs on a small percentage of leases.  Thus, Defendants contend, conducting site-
specific assessments on land parcels prior to the submission of a proposal for drilling operations
would be expensive and time-consuming.  Although the subject of this litigation is now narrowed
to about seven thousand acres encompassed within four land parcels, the document initially
opened up almost four million acres to potential mineral leasing, including portions of the Nutt
Grasslands.  The agency did not, and does not, know which tracts will end up being leased until
they are sold, nor does it know which tracts will be drilled until a lessee submits an Application
for Drilling Permit ("APD") and it is approved by the BLM.  In other words, the Agency cannot
evaluate consequences and impact of development until site-specific plans are submitted by the
lessee.

Defendants also recognize that the need for further NEPA is required, but states that BLM

is reserving an examination of site-specific effects for a later time when concrete operational plans are presented for approval upon a lessee's application for drilling.  See, AR 3012 ("Specific projects for a given area or resource will be detailed in future activity plans. . . ."); AR 3150 ("Site-specific environmental analysis will be conducted for specific projects and proposals prior to implementation . . . Environmental Assessments (EAs) will be completed before starting any project.  All EA's will be available for public review"); AR 3408 ("The Mimbres RMP/EIS contains a general, broad level of planning and environmental analysis.  Site-specific analyses will be conducted later when specific areas are known and before any projects are implemented to evaluate impacts on the local resources").  BLM further argues that site-specific analysis done at the pre-leasing level serves no purpose when the agency maintains authority to permit activities on leases based on a lessee's proposed plans and the Agency's environmental analysis of them.

I have reviewed the relevant case law, and find that Plaintiffs' position that Defendants were obligated to conduct a NEPA pre-leasing analysis is not legally supportable, in light of the 1993 RMP that was completed, and the subsequent DNA.  Defendants offer a Tenth Circuit case, and a Ninth Circuit case, which I find persuasive and more on point.  The cases on which Plaintiffs rely are easily distinguishable on their facts.

In Park County Resource Council, Inc. et al v. U.S. Dep't of Agriculture et al., 817 F.2d 609, 616 (10th Cir. 1987) (overruled on other grds., Village of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970 (10th Cir.(N.M.) Feb 11, 1992)), the plaintiffs argued that BLM had to prepare a comprehensive EIS before issuing leases.  BLM had completed an EA in which the agency looked at various alternatives in the issuance of oil and gas leases.  As a result of the EA, the agency concluded that the preferred alternative was to recommend lease issuance with appropriate stipulations.  Defendants' position in that case, as it is in this case, was that lease

issuance itself was "essentially a paper transaction [which] does not usually require prior preparation of an EIS."  817 F.2d at 621.  The Tenth Circuit apparently agreed with this position, holding that BLM did not act arbitrarily and capriciously in deciding not to prepare an EIS in the pre-leasing stage because leases were not "major federal actions" which in themselves did not cause a change in the physical environment.  In that case – as in this case – the NEPA document specifically noted that prior to any drilling activity, the need for a site-specific, much more comprehensive EIS would be examined.  817 F.2d at 612.

I also find the recent Ninth Circuit case, Northern Alaska Environmental Center v. Kempthorne, 457 F.3d 969, 976 (9th Cir. 2006) to be persuasive on the question of whether the EIS needs to be site-specific at the pre-leasing stage.  The Northern Alaska plaintiffs (like Plaintiffs here) contended that the analysis undertaken for the EIS was inadequate because it lacked site specific analysis for particular locations on Alaska's North Slope where drilling might occur.  BLM responded (as BLM responds here) that no specific drilling site analysis was possible until it became known where the drilling was likely to take place, and that could be known only after leasing and exploration.

The Ninth Circuit in Northern Alaska  granted summary judgment to defendant, finding that the EIS "was sufficiently site specific without analysis of the environmental effect with respect to each parcel involved in a possible lease."  The Ninth Circuit held that BLM was not required at the leasing stage to do a parcel by parcel examination of potential environmental effects.  Since those effects were unidentifiable at that stage, the parcels likely to be affected were not yet known.  Such analysis "must be made at later permitting stages when the sites, and hence more site specific effects, are identifiable." 457 F.3d at 977.  The court also noted that NEPA applies at all stages of the process for any proposed action, and thus, plaintiffs would have a shot

to comment on a future EIS that would analyze the potential impacts of exploration and development before any such activity starts.   457 F.3d at 977-78.

In the case at bar, close to one hundred land tracts were offered for lease.  At the earliest stage of leasing, the agency could have no way of knowing which tracts would be leased, or what plans for development would eventually materialize on the parcels that were sold.  Thus, site-specific analysis would be impractical, speculative and unduly expensive.  BLM has conceded that further analysis is necessary, and will be done, prior to site-specific activities in order to fully comply with its NEPA obligations.

The next question is whether the 1992 EIS was sufficient for the purposes of the lease sale.  I would agree with the reasoning in both Park County and Northern Alaska, and find that BLM did not act arbitrarily and capriciously when it decided not to perform site-specific analyses on all land parcels offered for lease sale when carrying out the 1992 EIS that became part of the RMP/FEIS.  Based on my review of the document, discussed above, I find that the RMP/FEIS took a sufficiently "hard look" to satisfy NEPA's requirements.  Thus, BLM's decision to rely on the subsequent DNA in not conducting further analysis was not arbitrary and capricious.

Plaintiffs rely on Pennaco Energy, Inc. et al v. Dep't of Interior et al., 377 F.3d 1147, 1151 (10th Cir. 2004), for the proposition that the point of *leasing* is the point of commitment which requires site-specific NEPA analysis.  However, Pennaco cannot be read beyond its particular facts.  In Pennaco, it was undisputed that coal bed methane ("CBM") extraction was envisioned for the offered land parcels.  CBM extraction produces an amount of water significantly greater than water production associated with non-CBM oil and gas development.  Pennaco, 377 F.3d at 1158.  Yet, the agency had never considered or discussed CBM extraction in the pre-leasing RMP/FEIS that was completed fifteen years prior to the issuance of leases.  The

Tenth Circuit held that a *post*-leasing project level study which did address the potential

environmental impacts of CBM mining was insufficient, since that document did not consider

whether leases should have been issued in the first place.

Pennaco is inapposite here.  The only type of oil and gas development being considered

for the parcels at issue is the conventional method.  BLM has already taken a broad but

comprehensive "hard look" at the potential environmental effects of oil and gas development in

the 1993 RMP/FEIS for the land being offered for lease sale, including the area known as the

Nutt Grasslands.  Pennaco is also inapposite because the BLM in that case conceded in the pre-

lease RMP/EIS that existing NEPA documents were not adequate to address the environmental

impacts of CBM development.  There is no such concession here.

The cases on which Plaintiffs rely do not support Plaintiffs' position because the cases are

factually and significantly distinguishable.  In Southern Utah Wilderness Alliance v. Norton, 457

F.Supp.2d 1253 (D.Utah,2006), the District of Utah recently considered whether an oil and gas

lease sale on federal public lands violated NEPA.  The court found that BLM violated NEPA by

selling leases in one of its field offices without first preparing an adequate pre-leasing document,

despite "new information" it received by the Southern Utah Wilderness Alliance ("SUWA").

SUWA's facts are substantially different from the facts in the instant case.  In SUWA, the

agency relied on DNA documents, which in turn, relied on other non-NEPA documents

("Management Framework Plans, or "MFP") in deciding not to conduct an environmental analysis

prior to the lease sale.  BLM had never conducted an EA or EIS on the lease areas.  These are not

the same facts facing the Court in this case.  Prior to the time the BLM offered land within the

Mimbres Resource Area for lease sale, BLM had already conducted a NEPA assessment within

the 1993 RMP.  The subsequent DNA did not rely on another non-NEPA document (as the

agency did in the SUWA case), but rather was based on a NEPA document – the RMP – which had taken the requisite "hard look" at the potential environmental effects of oil and gas development in the area.

Plaintiffs also cite to an appeal from an agency decision, where the Interior Board of Land Appeals ("IBLA") decided that DNA's "cannot properly be used to supplement previous EA's or EIS' or to address site-specific environmental effects not previously considered in them." See, Center for Native Ecosystems, 170 IBLA 331, 332 (Dept. Int Nov. 22, 2006). The Board also held that DNA's "cannot supplement what is not sufficient in NEPA documentation." 170 IBLA 345.

The IBLA's determination in that case does not negatively impact on BLM's decision regarding the Nutt Grasslands in this case. First, the BLM did not purport to conduct a site-specific analysis in the 2002 DNA. The Agency has explained that it is reserving site-specific analysis for a later time, which as discussed previously, does not violate NEPA requirements for oil and gas lease sales on federally-owned lands. Second, BLM did not rely on the DNA to supplement the RMP/FEIS, as it did in Native Ecosystems. The DNA specifically states that the existing NEPA analysis was adequate to address the impacts of the proposed lease sale action.

In two other cases cited by Plaintiffs, Conner v. Burford, 848 F.2d 1441 (9th Cir. 1986), and Sierra Club v. Peterson, 717 F.2d 1409 (D.C.Cir. 1983), the agency had not conducted an environmental review as rigorous as the one done for the Mimbres Resource area. In Conner, the Ninth Circuit held that the leasing decision was an "irretrievable commitment of resources" which triggered the duty to perform NEPA analysis. However, the agency had prepared only several EA's to support its oil and gas leasing decision, which the court decided was not sufficiently detailed to fulfill the agency's NEPA responsibilities. 848 F.2d at 1443, n.2. In Sierra Club, the

agency had not prepared an EIS prior to a lease sale of national forest land.

Part of the basis for the court's decision in <u>Conner</u> was the fact that the agency had very limited authority to impose only mitigating conditions on applications submitted for drilling operations.  However, it should be noted that both <u>Conner</u> and <u>Sierra Club</u> predate the enactment of FOOGLRA which prohibits issuance of permits to drill until BLM has analyzed and approved a lessee's plans, <u>see</u>, 30 U.S.C. § 226(g).  These cases also predated the Department of Interior's regulation at 43 C.F.R. § 3162.3-1(h) which authorizes the agency to explicitly disapprove applications for drilling permits.  <u>See</u>, 53 FR 22814-01 at  *22846.

In another case recently decided by this district, <u>New Mexico v. Bureau of Land Management</u> ("Otero Mesa"), U.S. District Judge Bruce Black found that BLM was required to conduct some site- specific environmental analysis of oil and gas development project prior to issuing leases for land located in the Bennett Ranch Unit on Otero Mesa.  459 F.Supp.2d 1102, 1119 (D.N.M. 2006) ("<u>Otero Mesa</u>").  In that case, BLM had adopted an RMP Amendment and final environmental impact statement.  Judge Black determined that the dispositive question was whether the case at bar was more similar to <u>Park County</u> or <u>Pennaco</u>.  459 F.Supp.2d at 1117 ("The task for this Court . . . is to decide whether the . . . lease situation is more similar to the situation in <u>Park County</u> or the one addressed in <u>Pennaco</u>").  The court found that <u>Pennaco</u> was more similar because the Tenth Circuit in that case considered it highly significant that an irreversible commitment of resources occurs at the lease stage.  The BLM in that case also did not have the authority to completely forbid any drilling or other surface disturbance on the lease parcel once the lease is issued on non-NSO lease parcels.  Judge Black thus followed <u>Pennaco</u> in holding that BLM had not complied with NEPA, and could not execute the lease before completing some type of site-specific environmental analysis.  459 F.Supp.2d at 1119.

I am not inclined to follow either <u>Pennaco</u> or <u>Otero Mesa</u> in determining whether BLM violated NEPA by not completing additional NEPA analysis prior to the lease sale in the Nutt Grasslands.  I have already explained why <u>Pennaco</u> is distinguishable: the violation of NEPA was based primarily on the agency's complete omission of any discussion of the particular type of oil and gas extraction envisioned for the land parcels – CBM extraction – rather than the absence of site-specificity in the EIS, as well as BLM's concession that the existing NEPA documents were not adequate to address the environmental impacts of CBM development.

<u>Otero Mesa</u> is pending appeal in the Tenth Circuit.  <u>See</u>, <u>New Mexico v. Bureau of Land Management</u>, Civil No. 05-460 BB/RHS, Doc. 143 (Notice of Appeal, filed Dec. 6, 2006).  In <u>Otero Mesa</u>, Judge Black noted that one of the factors contributing to the Tenth Circuit's holding in <u>Park County</u> was the high likelihood that the large 10,000-acre leased parcel would not be developed at all, and the recognition that any EIS performed on such an area would "necessarily be boilerplate that would 'likely result in the absence of site-specific proposals.'" 459 F.Supp.2d at 1118.   Low probability of development was not a factor in <u>Otero Mesa</u> – development of the leased parcel was reasonably certain.  However, oil and gas development in the leased parcels within the Nutt Grasslands area is uncertain.  All leased parcels are subject to a ten-year lease term, and if not producing quantities of oil and gas by that time, the lease automatically terminates.  It is worth noting that many of the leases at issue in this lawsuit when it was filed have since terminated or closed.

I find that the situation in the instant case is closer to that in <u>Park County</u>, rather than either <u>Pennaco</u> or <u>Otero Mesa</u>.   The Tenth Circuit noted in <u>Park County</u> that:

> The oil and gas lease, by itself, does not cause a change in the physical environment. In order to work the lease, the lessee must submit site-specific proposals to the Forest Service and BLM who can then modify those plans to address any number of environmental considerations. Each action is subject to continuing NEPA review."

817 F.2d at 621-22.

Plaintiffs are correct that Park County does not eliminate Defendants' duty to comply with its NEPA obligations.  However, the only role for a court "is to insure that the agency has taken a 'hard look' at environmental consequences." Pennaco, 377 F.3d at 1151.  I have already determined that 1993 RMP satisfied the agency's obligations to take the requisite "hard look" at the potential environmental impact of oil and gas development in the Grasslands area.   I have also determined that BLM was not required to be more site-specific in that document prior to offering the parcels up for lease sale. As was the case in Park County, the Agency's obligations will extend to conducting more site-specific analysis as developmental plans became more definite. 817 F.2d at 623.  Further, the Tenth Circuit noted that the agency's authority to impose mitigating measures post-leasing supported the reasonableness of its decision not to complete a pre-leasing EIS.  Id. at 621-22 (conditions mitigating environmental consequences of an action may justify an agency's decision not to prepare an EIS) (citations omitted).

## II.       Post-Leasing Analysis

Plaintiffs are concerned that post-leasing assessment is not the cure for what they contend is inadequate compliance with NEPA's requirements.  They argue that BLM's post-leasing control comes too late to correct deficiencies in the environment assessment, is limited in scope, and that decisions made at that point "miss the big picture" and become instead a "tyranny of small decisions."  Pltff's Mot. at 17 (citing Kern v. U.S. Bureau of Land Management, 284 F.3d

1062, 1078 (9th Cir. 2002).  They contend that once a lease is issued, BLM forfeits the authority

to deny a lessee the right to explore and develop the lease, unless the land is protected by NSO

restrictions.  For this reason, Plaintiffs argue that the agency should impose NSO restrictions on

all leased parcels.

Under the terns of all leases, lessees must conduct operations so as to minimize adverse

impacts to resources, and to observe reasonable measures deemed necessary by lessor," which

may include "modification to siting or design of facilities, timing of operations, and specification

of "reclamation measures."  AR 2021 (section 6, lease terms); AR 3016 (proposed alternative

summary).  A lessee's rights are subject to certain conditions:

> A lessee shall have the right to use so much of the leased lands as is necessary to explore
> for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold
> subject to: Stipulations attached to the lease; restrictions deriving from specific,
> nondiscretionary statutes; and such reasonable measures as may be required by the
> authorized officer to minimize adverse impacts to other resource values, land uses or users
> not addressed in the lease stipulations at the time operations are proposed.

43 C.F.R. § 3101.1-2 ("Surface Use Rights").

Plaintiffs contend that because the agency cannot interfere with a lessee's right to develop

the lease, and thus, the agency's authority to reject an application under § 3162.3-1, BLM's

authority is merely procedural.  It is true that the Agency cannot forbid all oil and gas

development on land for which it has issued leases.  However, it maintains considerable control

after leasing.  Even on non-NSO land tracts, BLM can condition permits for drilling and roads on

implementation of environmentally protective measures, and mitigation measures, and can even

reject the application unless and until such conditions are met.  See 43 C.F.R. § 3162.3-1.  Under

the lease terms, drilling and other surface disturbing activities are prohibited if a species protected

by the Endangered Species Act, will be adversely affected.  AR 404.  Permits to drill on oil and

gas leases issued under FOOGLRA are not granted "without the analysis and approval of the

Secretary concerned."  30 U.S.C. § 226(g).

Defendants' inability to preclude any and all surface operations subsequent to leasing is

not troubling, in the context of NEPA requirements.  The agency has already considered which

public lands posed environmental concerns sufficient to impose NSO stipulations.  AR 3035

("Which public land should be considered for competitive mineral material sales?"  Which public

land should be open to energy and nonenergy leasable mineral development subject to the terms

and conditions of the standard lease form, minor constraints such seasonal restrictions, or major

constraints such as no surface occupancy?"); see also Tr. at 43 and 51.[8]  The agency concedes

that it is possible the Agency could, in rare circumstances, overlook some area of concern that is

not part of the lease conditions.  In such circumstances, 43 C.F.R. § 3162.3-1(h)(2) provides

express authority to disapprove drilling applications which would violate NEPA if approved.  As

the agency notes, the federal government would be afforded the same opportunity to breach a

contract, and be subjected to the same contractual liability as any other business entity.  Tr. at 37-

38.  See, Center v. Kempthorne, 457 F.3d 969, 976 (9th Cir. 2006) ("The government can

condition permits for drilling on implementation of environmentally protective measures, and we

assume it can deny a specific application altogether if a particularly sensitive area is sought to be

developed and mitigation measures are not available).

Defendants plan on conducting further NEPA analysis during the permit application stage.

One "cannot assume that government agencies will not comply with their NEPA obligations in

_____

[8]  "Tr." refers to the Transcript of the hearing on January 24, 2007.

later stages of development."  Conner v. Burford, 848 F.2d at 1448.  At any rate, Plaintiffs will

have the chance to object at a later stage, should they believe that the agency is delinquent in

completing its NEPA obligations for the leased parcels.  Northern Alaska Environmental Center,

457 F.3d 969, at 977-78 (plaintiffs will "be able to raise more focused criticisms of site analysis at

the exploration and permit stages of the leasing program").

Accordingly, I find and conclude that BLM did not fail to comply with its mandatory

duties under NEPA.  Its decision not to conduct further NEPA analysis after the 1993 RMP and

the 2002 DNA, and its decision to rely on the RMP/FEIS and the DNA in order to proceed with

the lease sale, was not arbitrary or capricious.  My conclusion is based in part on the finding that

the 1993 RMP took the requisite "hard look" at the environmental consequences of oil and gas

leasing in the area which included the Nutt Grasslands, as well as the Agency's authority to

impose considerable mitigation measures as a condition for lessees' application approval.

## III.    Wilderness

Federal agencies must address potential wilderness-quality lands through NEPA.  The

FLPMA requires an agency to identify federal lands as "wilderness study areas" ("WSA's"), and

to recommend some of these as suitable for wilderness designation by Congress.  43 U.S.C. §

1782; Norton v. SUWA, 124 S.Ct. 2373, 2376-77 (2004).

At the hearing, I mentioned that, based on my review of the NEPA documents completed

by BLM , I found no merit to the contention that Defendants did not meet its NEPA obligations

with respect to wilderness considerations.  Tr. at 63-65.  I reiterate that finding here.  Contary to

Plaintiffs' assertion otherwise, BLM *did* consider wilderness values prior to making the decisions

to lease the challenged parcels.  The leasing decision relied on the FEIS, which examined

wilderness values in the area, including the potential effects of oil and gas leasing on livestock

habitat and grazing, and potential displacement of wildlife, were substantially considered by the

agency. See, e.g., AR 67-70.   Also, BLM completed a wilderness inventory of the Mimbres

Resource Area in 1980, and designated 14 WSA's within that area.  AR 3140.  Since 1980,

portions of seven of these WSA's have been recommended as suitable for wilderness designation,

while the remaining portions of those seven, as well as the other seven, were recommended as

nonsuitable for wilderness designation.  Id.

    None of the challenged leases are located in a WSA.  Plaintiffs contend that BLM failed to

address "new information" regarding potential wilderness quality lands in a pre-lease NEPA

analysis for the Nutt Grasslands North and South Units.  Plaintiffs' main concern is that BLM

erroneously looked at a different wilderness proposal located to the east of the Nutt Grasslands

leases – the Robledo-Sierra de Las Uvas Citizen Wilderness Proposal of the New Mexico

Wilderness Alliance – rather than the Nutt Grasslands Citizen's Wilderness Proposal which had

been submitted.  Defendants do not contest this fact, but argues that Plaintiffs had not submitted

any new information that should have triggered a reassessment of the wilderness assessments that

had already been completed.

    I agree with Defendants on this issue as well.  The "new information" consists essentially

of the group's disagreement with the agency's conclusion that the area lacked potential for

solitude and recreation, "due to the relatively flat terrain and small size of the area."  AR 557.

However, the Agency had already examined wilderness values in the FEIS, for example: mapping

out WSA's (AR 3010 and 3077); special management areas (AR 3085); scenic trails (AR 3086),

areas which restrict vehicle use (AR 3090); and recreational areas (AR 3099).  Thus, the

provision in BLM's Handbook which required a Wilderness Inventory in certain situations where

there is documentation of new or supplemental information regarding resource uses, would not apply here.

Moreover, BLM's obligations under NEPA did not necessarily extend to considering the Citizen's Wilderness Proposal at that time. The agency had developed a practice, included in its own policy handbook, of allowing citizen groups with concerns over wilderness values to submit these concerns to the agency for its consideration. Apparently, BLM no longer engages in this practice or has this policy. Tr. at 45-46.

This is not to say that careful consideration of the proposal would not be appropriate at another stage of analysis. For example, if the Court had found that site-specific analysis was required in the pre-leasing stage, then BLM would have been required to consider Plaintiffs' wilderness proposal as part of agency's obligations to assess all aspects of environmental impact and to consider all public comments that are submitted to the Agency.[9] However, since I have determined that no further NEPA analysis was necessary in the pre-leasing period, BLM did not violate NEPA by failing to consider the Nutt Grasslands Citizen Wilderness Proposal, even if it did contain new information on the wildlife issue.

Plaintiffs cite to Oregon Natural Desert Assoc'n v. Rasmussen, et al., 451 F.Supp.2d 1202 (D.Or. 2006) ("ONDA") to support their position that BLM was obligated to address the Nutt Grassland's potential wilderness values in a NEPA process tailored to address the proposed lease

---

[9] NEPA requires the Government to only consider public comments. "There is no obligation to implement citizen proposals, or even resource agency proposals; however, prudent comments and suggestions are incorporated into the project design to the extent practical." Hickory Neighborhood Defense League v. Burnley, 703 F.Supp. 1208, 1225 (W.D.N.C.,1988), vacated in part on other grds. by, Hickory Neighborhood Defense League v. Skinner, 893 F.2d 58 (4th Cir.1990).

sale *prior* to leasing surface use rights to develop mineral resources.  In that case, the District of

Oregon agreed with the <u>ONDA</u> plaintiffs that BLM did not take a "hard look" at the wilderness

issue, mainly because it did not properly use the citizens' group inventory to help it decide

whether there were changes or additions to the wilderness values in the area.  BLM had

conducted an inventory in 1989 of public lands in south-central Oregon to identify which areas

should be preserved as wilderness.  In 2004, BLM completed an EA to address problems which

were discovered to be occurring in 1998 and 2000, related to damage by wildfire and livestock

grazing. The EA, completed in 2004, suggested several alternatives to address the problems, and

selected an alternative that involved constructing a barbed-wire fence designed to keep livestock

out of the targeted riparian areas.  In early 2005, the ONDA presented to BLM its own

wilderness inventory (the Spaulding inventory), using a protocol from a BLM handbook.  The

ONDA inventory purportedly provided "significant new data" on wilderness resource values and

characteristics.  However, BLM declined to include the additional wilderness areas in its NEPA

analysis, and in 2005, BLM issued its final decision to implement the alternative it had selected.

The court found that, as a result, BLM did not have sufficient current information on wilderness

values for the area in order to make an informed, adequate determination of the environmental

impact of the proposed action.

    <u>ONDA</u> is fairly distinguishable from the <u>Chihuahuan Grasslands</u> case which is before the

Court.  First, in <u>ONDA</u>, BLM had conducted only the preliminary step of an EA, rather than the

lengthier and more expensive EIS – which the agency has completed here in the <u>Chihuahuan</u> case.

Second, in this case, Defendants have admitted that it has not completed its post-leasing NEPA

analysis.  As mentioned earlier, the Agency's obligation to consider the Citizen's Wilderness

Proposal as a submitted public comment hinges on its obligation to perform more site-specific

environmental analysis -- which will not occur until an application for operations is submitted on

each of the leased parcels.

The Court's role on this issue is limited to making a determination whether the Agency

examined the relevant data and articulated a rational connection between the facts found and the

decision made.  Olenhouse, 42 F.3d at 1574.   For the foregoing reasons, I am convinced that the

Agency has presented substantial evidence that its examination of the wildlife issue satisfied its

NEPA obligations.

## IV.    Whether BLM Failed to Consider a Reasonable Range of Alternatives

NEPA obligates federal agencies to "study, develop, and describe appropriate alternatives

to recommended courses of action in any proposal which involves unresolved conflicts concerning

alternative uses of available resources" and to consider alternatives to the proposed action. 42

U.S.C. § 4332(E) and § 4332(2)(C)(iii).  Agencies must "rigorously explore and objectively

evaluate all *reasonable* alternatives. . . ."  40 C.F.R. § 1502.14(a) (consideration of alternatives is

the "heart of the environmental impact statement") (emphasis added).  The reasonableness test

applies to both to the alternatives themselves as well as to the "extent to which [the agency]

discusses them."  Utahns for Better Transportation et al v. Dep't of Transportation, 305 F.3d

1152, 1166 (10th Cir. 2002).  The "reasonableness" of the inquiry is critical in order to preclude

agencies from "defining the objectives of their actions in terms so unreasonably narrow they can

be accomplished by only one alternative. . . ."  Colorado Environmental Coalition et al. v.

Dombeck et al., 185 F.3d 1162, 1174 (10th Cir. 1999).

Plaintiffs contend that BLM failed to consider a reasonable range of alternatives, including

a "non-fluid minerals" alternative – either in the form of a "no action" alternative or some other

action alternative designed to protect the other (non-fluid mineral) resources and values of the

Nutt Grasslands.   However, this contention simply does not stand up against what the record

shows the agency considered in the RMP/FEIS.  Based on my review of this record, the Court is

satisfied that BLM applied a rigorous standard to the exploration of a reasonable range of

alternatives, as required to meet NEPA's pre-leasing requirements.

The document considered in detail four alternatives, including a no-action alternative, for

every one of the four issues and nine management concerns identified during early planning and

assessment, and enumerated in the FEIS.   AR 10-11 (Record of Decision); AR 3014-3019 (Table

S-1, summary).  Each of the four alternatives also considered possible actions in the context of all

nine management concerns.  As one example, in the context of Management Concern 2, Minerals

(at AR 3035-36), the proposed plan calls for the withdrawal of 64,000 acres from "locatable

mineral entry." Alternative A would essentially maintain the status quo. Alternative B would close

a greater number of acres to mineral leasing, impose NSO stipulations on a greater number of

acres, and would leave open for leasing, subject to standard terms and conditions, slightly fewer

acres than the proposed plan. Alternative C would close no acreage to mineral leasing, would

impose NSO stipulations on a smaller number of acres, and leave open for leasing, subject to

standard terms and conditions, a slightly greater number of acres than in the proposed plan.  The

agency performed the same detailed review for all four issues and all nine management concerns.

In addition, the EIS considered the effects of each of the alternatives in the context of the

issues and management concerns. AR 3031-40.   The subsequent DNA specifically examined

whether the RMP/FEIS addressed NEPA's requirement that agencies consider alternatives, and

concluded that the range of alternative in the RMP was appropriate for the current proposed action.  The DNA noted that the "environmental concerns, interests, resource values, and circumstances have not changed."  AR 337.

Plaintiffs may argue that the range of alternatives should have been broader, or believe that other alternatives should have been included for the agency's consideration.  However, the only question here is whether, in meeting NEPA's requirement that agencies consider alternatives, it was arbitrary and capricious for the BLM to rely on the 2002 DNA (which in turn relied on the 1993 RMP) and not conduct further NEPA analysis.  Cmp., Pennaco, 377 F.3d at 1161 (question is not whether documents relied upon by agency "pass muster," but whether IBLA's determination that documents did not "pass muster" was arbitrary and capricious).

What NEPA requires is an objective evaluation of all "reasonable" alternatives.  I find that the Agency met its pre-leasing NEPA obligations to study, develop and describe a range of appropriate alternatives for the use of available resources.  I also find that the Agency's decision in the DNA not to conduct further analysis in this regard was not arbitrary or capricious.

V.      **Public Participation**

Count 4 asserts that Defendants failed to involve the public in the Nutt Grasslands Lease and the execution of the RMP/FEIS.  However, Plaintiffs have not included this issue in any of the briefing, and I assume that this issue has since been abandoned.

Also, at this point, the issue would have little or no merit.  The Complaint states that the Agency failed to provide the public with adequate notice and an opportunity to comment with regard to the execution of the RMP as well as the Nutt Grasslands Lease Sale.  However, Plaintiffs do not specify the particular shortcomings of public notice and comment.  It appears

from the record that Defendants did provide notice of the lease sale, which triggered two rounds of protests by Plaintiffs; and that public comment preceded the publication of the final RMP.

If Plaintiffs would argue lack of public notice and opportunity to comment following the submission of the Nutt Grasslands Citizens Wilderness Proposal, such a contention would be premature. By Defendants' own representations, additional consideration of wilderness and other resources is planned for a later stage in the leasing process, when site-specific analysis can be tailored to the particular operations – if any – planned for individual parcels by the lessee. Notice and opportunity for public comment would be more appropriate at that time.

## CONCLUSION

I find and conclude that BLM did not fail to comply with its mandatory duties under NEPA concerning Defendants' decision to lease certain parcels of land located within the Nutt Grasslands in 2002. Its decision not to conduct further NEPA analysis after the 1993 RMP and the 2002 DNA, and its decision to rely on the RMP/FEIS and the DNA in order to proceed with the lease sale, was not arbitrary or capricious.

I also find and conclude that the steps taken by Defendants to meet its obligations under NEPA regarding examining a range of alternatives was not arbitrary or capricious.

Finally, I find no merit to Plaintiffs' assertion that Defendants failed in the duty to provide adequate public notice and opportunity for comment, as alleged in the Complaint in Count 4. Plaintiffs have not argued this issue, nor provided any specifics regarding what notice was lacking. In addition, the assertion with regard to public comment following the Plaintiffs' submission of the Citizen's Wilderness Proposal is premature, for above stated reasons.

**THEREFORE,**

**IT IS ORDERED** that Plaintiffs' Motion for Review of Agency Action (**Doc. 19**), is

hereby DENIED for reasons set forth in this Memorandum Opinion and Order.

A Judgment shall be entered in accordance with this Memorandum Opinion and Order.

UNITED STATES DISTRICT JUDGE